(No. 87089.—

## THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ERIC LEE, Appellant.

*Opinion filed February 16, 2001.—Supplemental opinion filed on denial of rehearing July 26, 2001.*

GARMAN, J., took no part.
THOMAS, J., dissenting.

Charles M. Schiedel, Deputy Defender, and Lawrence Bapst, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

James E. Ryan, Attorney General, of Springfield, and Michael Kick, State's Attorney, of Kankakee (Joel D. Bertocchi, Solicitor General, and William L. Browers and Margaret M. O'Connell, Assistant Attorneys General, of Chicago, of counsel, and Kristen Hopkins, law student), for the People.

JUSTICE FREEMAN delivered the opinion of the court:

Following a bench trial, the circuit court of Kankakee County convicted defendant, Eric Lee, of first degree murder (720 ILCS 5/9—1(a)(1), (a)(2) (West 1996)) of a police officer and aggravated vehicular hijacking (720 ILCS 5/18—4(a)(3) (West 1996)). At a subsequent death

penalty hearing, a jury found defendant eligible for the death penalty and concluded that there were no mitigating factors sufficient to preclude the imposition of a death sentence. The trial court sentenced defendant to death for the murder and to 30 years' imprisonment for the aggravated vehicular hijacking. Defendant's execution has been stayed pending direct review by this court. Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rs. 603, 609(a).

## BACKGROUND

The evidence at trial established that defendant killed Officer Anthony Samfay during a routine traffic stop at approximately 4 p.m. on October 17, 1996. Gary Dehmer identified defendant as the man he saw shoot Officer Samfay. The police recovered defendant's driver's license from the front fender of Officer Samfay's squad car and defendant's automobile insurance card two feet east of the squad car. Officer Samfay died of multiple gunshot wounds to the head, neck, shoulder, chin and forearm.

The evidence at trial also established that defendant hijacked Joann Story's car. At approximately 6:30 p.m. on October 17, 1996, defendant approached Story as she opened her car door in a shopping center parking lot. Defendant asked Story for her keys. She refused. Defendant opened his coat and started to pull a gun from his waistband. Story tossed the keys in the air and ran back into the store she had just left. Store personnel called 911 and Story gave a description of her vehicle to the police. Approximately one hour later, the police arrested defendant as he drove Story's car on Interstate 57.

The police recovered a loaded .357 Magnum revolver from the passenger side floorboard of Story's car. A forensic scientist testified that six empty cartridge cases recovered from defendant's bedroom, a bullet recovered from the fender of Officer Samfay's squad car, a bullet recovered from Officer Samfay's bulletproof vest, and bullet jackets recovered from Officer Samfay's body dur-

ing the autopsy were fired from the .357 Magnum revolver to the exclusion of all other revolvers.

The State also introduced into evidence a videotape of defendant's confession to the shooting and the vehicular hijacking. The defense did not present any testimony at trial, but introduced an exhibit into evidence and made another exhibit part of the record. As noted above, the trial judge convicted defendant of murder and aggravated vehicular hijacking.

The State sought a death penalty hearing based on the statutory aggravating factor that the murder victim was a police officer killed in the course of performing his official duties. 720 ILCS 5/9—1(b)(1) (West 1996). Defendant elected to have a jury determine his eligibility for the death penalty and hear evidence in aggravation and mitigation. At the conclusion of the first, or eligibility, phase of the death penalty hearing, the jury determined that defendant was at least 18 years of age when he committed the murder, and that the State had shown the existence of a statutory aggravating factor beyond a reasonable doubt.

At the second, or aggravation and mitigation, phase of the death penalty hearing, the State presented evidence that defendant shot Officer Samfay with hollow point bullets, with some of the shots fired while Officer Samfay was on the ground. The testimony also showed that, in defendant's bedroom, the police found a federal firearms license application form; law enforcement and military equipment periodicals; gun and ammunition periodicals; and a catalog advertising automatic weapons and silencers. In his confession, defendant stated that, when transporting his gun, he kept it under the passenger side seat of his car. A witness testified that defendant carried a firearms owner's identification card in his wallet. However, a firearms owner's identification card does not allow a person to carry a concealed weapon or

to carry a loaded weapon in the passenger side compartment of a car.

In mitigation, defendant's adoptive parents testified regarding problems that he had as a child. Several members of defendant's biological family testified regarding mental disorders and substance abuse in defendant's biological family. Defendant also presented expert testimony regarding his current mental condition and his mental condition at the time of the shooting. One expert testified that the shooting could be viewed as a manifestation of the mental disorders from which defendant suffers. Another expert testified that defendant was experiencing mental and emotional distress at the time of the shooting.

In rebuttal, the State presented the testimony of Dr. Mathew Markos. Dr. Markos disagreed with the defense experts. In his opinion, defendant was not suffering from any significant psychopathology at the time of the shooting. Three of defendant's former coworkers also testified on the State's behalf. They stated that defendant was able to deal with stress and frustration at work, that there was no change in defendant's behavior on the day of the shooting, and that defendant did not complain about being upset on the day of the shooting.

At the conclusion of the second phase of the death penalty hearing, the jury determined that there were no mitigating factors sufficient to preclude the imposition of a death sentence. Accordingly, the trial court sentenced defendant to death.

Defendant does not question the sufficiency of the evidence of his guilt. Nor does he claim error in any ruling made at the guilt and innocence phase of his trial. Rather, defendant asserts that numerous errors occurred at the death penalty hearing.

## DISCUSSION

Defendant contends that he was denied a fair death

penalty hearing because: (1) the trial judge ordered that defendant submit to a psychiatric examination by Dr. Markos; (2) the trial judge denied defendant's request for a continuance to adequately prepare a rebuttal to the evidence presented by Dr. Markos; and (3) the trial judge failed to admonish defendant that he had a right to refuse to be examined by Dr. Markos. Defendant also contends that his rights under the fourth amendment and fifth amendment to the Constitution were violated because he was forced to submit to the psychiatric examination and give evidence against himself. The facts related to this contention follow.

In November 1996, defendant requested, and the trial court allowed, appointment of a forensic psychiatrist and a clinical psychologist to assist defense counsel in trial preparation. In June 1997, defendant requested, and the trial court allowed, appointment of a neurologist and a neuropsychologist to further assist defense counsel. At a hearing on August 20, 1997, defense counsel represented in open court that it was not currently counsel's intention to raise the insanity defense, nor did counsel anticipate raising the insanity defense at a later date.

On August 26, 1997, the State filed a motion requesting that the trial court order the disclosure of any expert opinions on defendant's mental status at the time of the commission of the offense. The State also requested that, prior to trial, the court order defendant to submit to an examination by a psychiatrist retained by the State. The defense protested there were no rules or statutes requiring defendant to submit to a psychiatric examination. The defense also maintained that the State's request for disclosure of any expert opinions must be denied because Supreme Court Rule 413 (134 Ill. 2d R. 413), governing discovery, applies to criminal trials but not to sentencing hearings. At a hearing on September 3, 1997, the trial court noted the inconsistency between the State's cur-

rent position and the State's position in earlier pretrial motions contesting defendant's right to discovery at a sentencing hearing in a death penalty case. The trial court reasoned:

"Speaking rhetorically, if there's no right to discovery at a sentencing hearing, what basis can there be in the law for appointing a psychiatrist and authorizing a psychiatrist or a psychologist to examine the defendant prior to a sentencing hearing?

\* \* \*

There is no authority cited for the appointment of a psychiatrist when the issue of insanity or sanity at trial does not exist. It seems to me that it's an issue of symmetry of application of the law.

Clearly, I think things have somehow ended up differently maybe than both sides thought they were or maybe traditionally how they end up in a case like this. I think typically it is the Defense attempting to get as much information as possible before sentencing hearing and, as was evidenced in these pretrial hearing, the State opposing that.

And the rule has been fashioned. There is no right to discovery in a sentencing hearing.

I am not convinced, [I] would not be violating this defendant's rights, including his constitutional right to exercise his 5th Amendment privilege, if I were to appoint a psychiatrist or psychologist and authorize them to go into his cell, with the defendant \*\*\* prior to trial, when the law in Illinois is that anything said by a defendant to a psychiatrist or psychologist \*\*\* can be used at a sentencing hearing."

The trial court denied both the request for a psychiatric examination and the request for disclosure of expert opinions.

On October 28, 1997, the State renewed its motion for an order requiring defendant to submit to a psychiatric examination. The State believed that defendant intended to plead guilty but mentally ill. The State argued that it had the right to have defendant examined by its own psychiatrist or psychologist, pursuant to sec-

tion 115—6 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115—6 (West 1996)). At a hearing on October 30, 1997, defendant stated that he would waive a jury on the issue of guilt or innocence and be tried by the court. The State withdrew its motion for a psychiatric examination.

The bench trial commenced on November 3, 1997, and ended on November 7, 1997, with the trial court finding defendant guilty of two counts of murder and one count of aggravated vehicular hijacking. The State then renewed its motion for disclosure of expert opinions and for a psychiatric examination of defendant. The State argued that, pursuant to section 9—1(e) of the Criminal Code of 1961 (720 ILCS 5/9—1(e) (West 1996)), it was entitled to a fair opportunity to rebut any information defendant might present at the death penalty hearing regarding his mental health. On November 10, 1997, the trial court ruled that defendant must transmit any written reports or statements of experts to the State no less than 72 hours prior to the date the expert would testify. However, the trial court denied the State's request for a psychiatric examination, finding that the court had no authority to order that defendant submit to such an evaluation.

Jury selection and the eligibility phase of the death penalty hearing followed. On December 1, 1997, opening arguments were presented in the aggravation and mitigation phase of the death penalty hearing. In his statement to the jury, defense counsel intimated that defendant was mentally ill at the time of the shooting. Also, the defense informed the jurors that defense experts would testify about the mental illness from which defendant suffers. On December 2, 1997, the State renewed its motion for a psychiatric examination of defendant. The State remarked that a defendant is afforded less constitutional safeguards once he has been convicted. Thus, there

is more reason then to allow a psychiatric examination of the defendant by an expert retained by the State once the defendant places his mental health at issue in the death penalty hearing. On December 3, 1997, the trial court determined that defendant should be examined by the State's expert. The trial court noted the State's representation that, in the event the court should deny the State's request for a psychiatric examination, the State would call an expert to testify as to defendant's mental health without benefit of an actual examination. The trial court believed that it was a lesser evil to allow the State's expert to examine defendant than to allow the State's expert to testify without benefit of an examination, and, possibly persuade the jury that defendant should be sentenced to death. The court reasoned "that the least that should be required of a psychiatrist whose opinion may subject a defendant to a death penalty is that he examine, and not perfunctorily, the individual who[se] mental state he purports to evaluate."

On December 8, 1997, defendant filed a motion asking the trial court to reconsider its rulings requiring disclosure by the defense of opinions prepared by defense experts, and requiring that defendant submit to a mental examination. Defendant maintained that the trial court could not require disclosure of the experts' opinions because Supreme Court Rule 413 does not apply to a death penalty hearing. Defendant also maintained there was no legal precedent for the trial court's order requiring a psychiatric examination. The trial court denied the motion.

At the second phase of the death penalty hearing, three experts testified on defendant's behalf. Dr. Antonio Yaniz, a board certified psychiatrist and neurologist, testified regarding defendant's hospitalization in 1989 in the mental health unit at Riverside Medical Center. Defendant had been admitted to the unit because he exhibited

explosive and violent behavior, he experienced mood changes, his grades at school had deteriorated, he had threatened to run away and was threatening to hurt his adoptive parents, and he was depressed over his adoptive parents' divorce. Upon observation and testing in the mental health unit, defendant was unable to view his situation realistically and to react appropriately. He appeared to lack a basic moral sense and was deficient in his ability to distinguish between right and wrong. The results of his Rorschach test suggested an absence of empathy for others, withdrawal, and emotional flatness. Dr. Yaniz testified that defendant's symptoms were consistent with a latent psychotic process. Dr. Yaniz believed there was a strong probability that the symptoms would become overt. His prognosis for defendant upon discharge was extremely guarded. Dr. Yaniz felt that defendant would have problems and that those problems could be severe and dangerous to others. Dr. Yaniz recommended residential treatment for defendant. Such being unavailable, Dr. Yaniz worked with defendants' parents and ordered community aids to minimize the risk defendant posed to others. On cross-examination, Dr. Yaniz testified that defendant's discharge summary from the mental health unit did not contain any reference to a latent psychosis.

Dr. Michael Gelbort testified as an expert in the field of neuropsychology. He performed a psychological assessment of defendant in July, 1997, consisting of a review of defendant's background, an interview of defendant, and administration of psychological tests to defendant. Dr. Gelbort found that defendant exhibited symptoms and problems reflective of underlying disorders. Defendant's thought processes were not logical and sequential; there were indications that defendant used autistic logic; defendant exhibited problems with reality contact, that is his perceptions were not always as accurate as a

normal individual's would be; and defendant was unable to recognize what was more important or less important. In Gelbort's opinion, the testing lent greatest support to a diagnosis of a paranoid schizophrenic disorder or a schizo-typal personality disorder.

Dr. Gelbort testified that there were correlations and consistencies between the test results and personality assessment during defendant's hospitalization at Riverside Medical Center and the test results obtained during his psychological assessment of defendant. Dr. Gelbort also testified that defendant is not constantly and consistently psychotic. Defendant will perceive, in a normal fashion, things that are fairly concrete, simple, and straightforward. There are other times when defendant will misconstrue, misunderstand, or misperceive reality. Certain stressors in defendant's life, especially his family situation, and his feelings of being abandoned and misunderstood, tend to decrease defendant's ability to think and behave in a normal way. Furthermore, defendant has fewer, and less effective, mechanisms for coping with stress. In Dr. Gelbort's opinion, the murder of Officer Samfay could be viewed as an extreme or acute manifestation of the disorders from which defendant suffers.

Dr. Daniel Hardy, an expert in the field of forensic psychiatry, performed a psychiatric assessment of defendant. He interviewed defendant and defendant's adoptive parents, and he reviewed defendant's adoption file, hospitalization records, and two psychological evaluations, along with records of the psychiatric hospitalizations of defendant's biological uncle. Dr. Hardy also reviewed the videotape of defendant's confession and the testimony of the officers who arrested defendant. In Dr. Hardy's opinion, defendant suffers from dysthymic disorder compounded by periodic episodes of recurrent major depressive disorder. At the time of the shooting,

defendant was experiencing extreme mental and emotional distress which, although not sufficient to constitute a legal defense of insanity, was a contributing factor to the commission of the crime.

In rebuttal, Dr. Markos, an expert in the field of forensic psychiatry, testified that he examined defendant on December 13, 1997. He questioned defendant at length regarding the circumstances leading to the shooting and defendant's state of mind. On the day of the shooting, defendant's adoptive mother informed defendant of her intention to marry Wellington Mack, a convicted murderer who was staying at her home following his release from prison. Defendant was not happy about the proposed marriage and the discussion with his adoptive mother turned into an argument. Defendant loaded his gun, intending to go target shooting at a range. On the way to the range, Officer Samfay stopped defendant for a traffic violation. Officer Samfay did not handcuff defendant or provoke him in any other way. Defendant, however, was still mad and upset over the argument with his adoptive mother. Defendant shot Officer Samfay, drove back home, reloaded his gun, and decided to leave town. When defendant's car failed to start, defendant obtained a ride to a bowling alley at a shopping center, where he proceeded to hijack a car and drive away from town. Defendant denied experiencing any delusions, hallucinations, and paranoid ideation, and also denied using any drugs or alcohol. Defendant stated further that, since the time of his arrest, he had not received any psychiatric treatment or been prescribed any psychotropic medication.

Dr. Markos also testified that he reviewed defendant's adoption file, evaluations and reports prepared by the defense experts and by Dr. Yaniz, and a summary prepared by Barbara Mann, a psychologist who examined defendant during his hospitalization at Riverside Medical Center. In Dr. Markos' opinion, defendant had integrated

well with his adoptive family, and the adoption process was reasonably satisfactory. Defendant experienced some difficulties with his adoptive parents as an adolescent but, generally, adolescence is a difficult period. Defendant's hospitalization as a teenager at Riverside Medical Center related to feelings of depression that defendant was experiencing. Defendant did not exhibit any thought process disorders, such as delusions, while at Riverside, or later. Defendant had adjusted to life in the general prison population. He participated in various prison programs, conducted himself reasonably well, and did not exhibit any psychiatric symptoms. Dr. Markos concluded that defendant was not currently suffering from any mental illness or defect. Further, Dr. Markos concluded that, at or about the time of the shooting, defendant was not suffering from any significant psychopathology.

In arriving at his conclusions, Dr. Markos reviewed the Tinley Park Mental Health Center records regarding the hospitalizations of defendant's biological uncle. Defendant's uncle suffered from adjustment disorder, a condition where an individual who is subjected to a particular stress or stressful situation manifests some psychiatric or mental symptoms like depression or anxiety. Dr. Markos explained that adjustment disorder is not a genetically transmitted illness. The fact that defendant's uncle suffers from adjustment disorder does not necessarily mean that defendant will also suffer from that disorder.

It is clear that Dr. Markos' testimony at the death penalty hearing was critical. For purposes of this appeal, however, the critical question is whether the trial court could require that defendant submit to the examination by Dr. Markos. The State concedes, and we agree, that section 115—6 of the Code of Criminal Procedure does not authorize the psychiatric examination in question.

Section 115—6 comes into play if a defendant gives notice that he may rely upon the defense of insanity at trial or if the defendant indicates that he intends to plead guilty but mentally ill or the defense of intoxicated or drugged condition. See 725 ILCS 5/115—6 (West 1996); *People v. Harlacher*, 262 Ill. App. 3d 1, 7-8 (1994). Defendant informed the trial court and the State that he would not rely upon any of these defenses at trial. Indeed, defendant did not present any testimony at trial.

The State also concedes, and we agree, that Supreme Court Rule 413 does not authorize a psychiatric examination of a defendant. Pursuant to Rule 413, a judicial officer may require that an accused submit to a reasonable physical or medical inspection of his body. See 134 Ill. 2d R. 413(a)(ix). However, a psychiatric examination is not "a 'medical inspection' of the type contemplated by the rule." *People v. Larsen*, 74 Ill. 2d 348, 352 (1979).

Nevertheless, the State maintains that the trial court's order requiring that defendant submit to the psychiatric examination was proper because the examination was necessary to provide the State a fair opportunity to rebut the expert testimony defendant presented in mitigation. Defendant counters that the supreme court rules governing discovery in criminal trials (134 Ill. 2d Rs. 411 through 415) are not applicable at a death penalty hearing. We agree that, as presently written, the supreme court rules governing discovery do not apply to death penalty hearings.

In *People v. Foster*, 119 Ill. 2d 69 (1987), this court considered the defendant's claim that the State was required to disclose notes on interviews it conducted with witnesses testifying in aggravation. The court noted that Rule 411 provides that the criminal discovery rules shall be applied in all criminal cases wherein the accused is charged with an offense for which, upon conviction, he might be imprisoned in the penitentiary. Thus, the crim-

inal discovery rules were designed for use in connection with criminal trials. The court reasoned:

"[A] defendant at the sentencing stage of a felony prosecution has already been convicted and, therefore, is 'entitled to fewer procedural safeguards than one who has not been convicted at all.' [Citations.] Indeed, it has repeatedly been held that the admissibility of evidence at the aggravation and mitigation phases of a sentencing hearing is not governed by the restrictive rules of evidence in effect at the guilt stage of the trial. [Citations.] As stated, discovery is not constitutionally required. We consider that. the defendant's request to change our discovery rules to include sentencing hearings is unnecessary in light of the present safeguards afforded a defendant in sentencing hearings." *Foster*, 119 Ill. 2d at 102-03.

See also *People v. Williams*, 147 Ill. 2d 173, 264 (1991).

In the case at bar, the trial court convicted defendant of murder and aggravated vehicular hijacking on November 7, 1997. On December 3, 1997, following opening arguments at the second phase of the death penalty hearing, the trial court ordered that defendant submit to a psychiatric examination by the State's expert. The trial court's order was not authorized either by statute or by rule. As such, the trial court's order was improper.

The State maintains that it must be afforded an opportunity to rebut the mitigation evidence presented by defendant. The State argues that the only way it could effectively rebut the mitigation evidence was to have its expert perform the psychiatric examination in question. The State requests that this court "impose a rule which is grounded in equity" allowing the psychiatric examination. We are cognizant of the problems confronting the State. However, the actions of the trial court and the actions of this court must be guided by the supreme court rules as presently written. At the time the trial court ordered defendant to submit to the psychiatric examination, such action was not authorized.

Having determined that the trial court's order requir-

ing that defendant submit to a psychiatric examination was improper, we must determine whether the error prejudiced defendant. We find that it did. Defendant was 23 years old when he killed Officer Samfay. Defendant did not have a criminal history; the murder and aggravated vehicular hijacking were his first criminal offenses. Defendant presented substantial evidence in mitigation, including the testimony of three experts regarding defendant's mental health. Discounting Dr. Markos' testimony, the State's evidence in aggravation consisted of the facts of the offenses defendant committed; defendant's admission that he transported a gun under the passenger seat of his car; testimony that defendant possessed certain periodicals and catalogs related to weapons and ammunition; and testimony that defendant was able to deal with stress at work and did not appear to be upset on the day of the shooting. With respect to the periodicals and catalog, the State did not, and could not, contend that it is illegal to possess these items. As to the testimony that defendant did not appear to be upset at work, defendant left work at 3 p.m., had a discussion with his adoptive mother regarding the proposed wedding when he returned home, left the house to go target shooting, and had the tragic encounter with Officer Samfay shortly thereafter.

Dr. Markos' testimony was critical to the State. Dr. Markos contradicted the defense theories that mental disorders ran through defendant's biological family; that defendant suffered harm from his abandonment by his biological mother, placement in foster care, separation from his foster care family and adoption by his adoptive family after he had bonded with his foster care family; that defendant was a troubled adolescent who was hospitalized for latent psychotic problems, but did not receive follow-up care after his discharge from the hospital; that defendant continued to experience prob-

lems after his discharge from the hospital and was less capable than others of dealing with stress; and that the murder of Officer Samfay was an explosive manifestation of the mental disorders from which defendant suffered. Dr. Markos also testified that defendant had adjusted to prison life and was not receiving psychiatric treatment in the penitentiary, even though, having been convicted of the present offenses, defendant was in a situation most people would find very stressful. Moreover, Dr. Markos' testimony had several indicia of reliability. The jury was informed that Dr. Markos' examination of defendant was done pursuant to a court order. Further, Dr. Markos was able to relate to the jury information given by defendant regarding defendant's state of mind on the day of the shooting.

We believe that defendant was prejudiced by the order requiring that he submit to the psychiatric examination. Accordingly, we remand to the trial court with instructions to hold a new death penalty hearing.

In light of our holding, we need not address defendant's remaining contentions regarding the psychiatric examination. Nor need we consider either the other errors allegedly made at the sentencing hearing, or defendant's contentions regarding the propriety of his death sentence and the constitutionality of the death penalty.

## CONCLUSION

For the aforementioned reasons, we affirm defendant's convictions of murder and aggravated vehicular hijacking, but we vacate the sentence of death. We remand the matter to the trial court with instructions to hold a new sentencing hearing.

*Convictions affirmed;*
*death sentence vacated;*
*cause remanded.*

JUSTICE GARMAN took no part in the consideration or decision of this case.

JUSTICE THOMAS, dissenting:

During defendant's death penalty hearing, defense counsel for the first time intimated to the death penalty jury that defendant was mentally ill at the time of the shooting, and told the jurors that defense experts would testify concerning the mental illness suffered by defendant. At this point, the trial court granted the State's motion for a psychiatric examination of defendant. At the second phase of the death penalty hearing, defense counsel presented three expert witnesses to testify on defendant's behalf. Dr. Markos then testified for the State in rebuttal. Under the circumstances, I believe the trial court acted within its discretion in granting the State's motion for a psychiatric examination of defendant.

The majority notes that neither section 115—6 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115—6 (West 1996)), nor Supreme Court Rule 413 (134 Ill. 2d R. 413), authorized the psychiatric examination of defendant. The majority states that "the actions of the trial court and the actions of this court must be guided by the supreme court rules as presently written." 196 Ill. 2d at 382. The majority then concludes that "[a]t the time the trial court ordered defendant to submit to the psychiatric examination, such action was not authorized." 196 Ill. 2d at 382. I do not agree that the lack of express authorization in section 115—6 or in any supreme court rule compels the conclusion that the trial court's order was improper.

Although authorization for the examination at issue cannot be found in section 115—6, I note that the limitation of section 115—6 is not applicable at a sentencing hearing. *People v. Silagy*, 101 Ill. 2d 147, 174 (1984). Likewise, the admissibility of evidence during the aggravation and mitigation phase of a death penalty

sentencing hearing is not governed by the restrictive rules of evidence in effect during the guilt phase of a trial. *People v. Foster*, 119 Ill. 2d 69, 102 (1987). This is because a defendant who has been convicted and is at the sentencing stage is entitled to fewer procedural safeguards than a defendant that has not yet been convicted. *Foster*, 119 Ill. 2d at 102.

The psychiatric examination of defendant took place during defendant's death penalty sentencing hearing. Section 9—1(e) of the Criminal Code of 1961 (720 ILCS 5/9—1(e) (West 1996)) provides for the introduction of evidence during a death penalty sentencing hearing. That section provides, in relevant part, that:

> "Any information relevant to any additional aggravating factors or any mitigating factors indicated in subsection (c) may be presented by the State or defendant regardless of its admissibility under the rules governing the admission of evidence at criminal trials. The State and the defendant shall be given fair opportunity to rebut any information received at the hearing." 720 ILCS 5/9—1(e) (West 1996).

Section 9—1(e) suspends the rules of evidence so that a jury may have all relevant information before it. *People v. Del Vecchio*, 105 Ill. 2d 414, 438 (1985). Accordingly, section 9—1(e) allows the introduction of evidence during a sentencing hearing that ordinarily would not be admissible during the guilt phase of a trial. *People v. Williams*, 181 Ill. 2d 297, 322 (1998). In fact, section 9—1 "is free from any limitation but relevance in sentencing hearings in death penalty cases." *Silagy*, 101 Ill. 2d at 174. A sentencing judge, then, has wide discretion concerning the sources and types of evidence used to assist in determining the kind and the extent of punishment to be imposed, within the limits fixed by law. *Williams*, 181 Ill. 2d at 322.

Based upon the foregoing, I believe that the decision to allow Dr. Markos to examine defendant was a matter within the trial court's discretion. The only limitation on

the trial court's discretion was relevance. Dr. Markos' examination of defendant and testimony concerning that examination during defendant's sentencing hearing were relevant to defendant's claim of mental illness. Because the examination and evidence were relevant, the trial court acted within its discretion in allowing the State a fair opportunity to rebut defendant's claim of mental illness. To hold otherwise would allow a defendant to "sandbag" the prosecution by waiting until after trial to raise questions concerning his competency. The defendant could then produce numerous expert witnesses to testify concerning his competency, knowing that the State would have no effective means to rebut that evidence. I do not believe our supreme court rules and case law require such a result. Although this court has never addressed the issue of a psychiatric examination similar to the one in this case, I note that prior decisions of this court recognize that where a defendant, at his sentencing hearing, raises the issue of his mental competency when he committed his offense, the State is entitled to rebut the defendant's claim. See *People v. West*, 137 Ill. 2d 558, 592 (1990); *People v. Ramirez*, 98 Ill. 2d 439, 467 (1983). Because defendant raised the issue of his mental competency at the time of the offense during his sentencing hearing, the State was entitled to rebut defendant's claim. For that reason, I would affirm the trial court's order requiring defendant to submit to a psychiatric examination by the State's expert.

## Supplemental Opinion Upon Denial of Rehearing

JUSTICE FREEMAN delivered the opinion of the court:

At the time of defendant's trial, the supreme court rules did not provide for discovery at a death penalty hearing. See *Foster*, 119 Ill. 2d at 102-03. Our holding in this case followed the dictates of the rules then in effect.

Shortly after this opinion was filed, this court determined that the discovery rules should be extended to death penalty hearings. At a death penalty hearing, the sentencing authority is asked to impose the ultimate penalty upon the defendant. We believe it is important that the sentencing authority possess the fullest information possible with respect to the defendant's life, character, criminal record and the circumstances of the particular offense. *People v. Williams*, 161 Ill. 2d 1, 62-63 (1994); *People v. Edgeston*, 157 Ill. 2d 201, 236 (1993). Allowing discovery furthers the goal of presenting complete information regarding the defendant to the sentencing authority.

Allowing discovery also addresses the concerns expressed by the legislature in section 9—1(e) of the Criminal Code of 1961 (720 ILCS 5/9—1(e) (West 1996)) that both the State and the defense have a fair opportunity to rebut testimony at the death penalty hearing. We recognize, however, that in the context of a death penalty hearing, discovery will not necessarily be reciprocal. Whereas the defendant cannot be compelled to provide discovery unless the State makes reciprocal disclosures, disclosure of information by the prosecution does not automatically entitle the State to disclosure from the defense. *People v. Williams*, 87 Ill. 2d 161, 165-66 (1981). Certain procedural safeguards embodied in our constitution serve to limit discovery by the defendant to the State to the end that a defendant will not be sentenced to death by the use of evidence he unwittingly provides. As the Supreme Court observed in *Estelle v. Smith*, 451 U.S. 454, 68 L. Ed. 2d 359, 101 S. Ct. 1866 (1981):

> "Just as the Fifth Amendment prevents a criminal defendant from being made ' "the deluded instrument of his own conviction," ' [citation] it protects him as well from being made the 'deluded instrument' of his own execution." *Estelle*, 451 U.S. at 462, 68 L. Ed. 2d at 369, 101 S. Ct. at 1873.

Pretrial discovery of defense information, whether for use at the guilt phase of trial or at the death penalty hearing, remains subject to constitutional limitations and limitations based on attorney-client or other privilege. The trial courts must do all they can to ensure that each defendant receives a fair trial and a fair sentencing hearing.

Our amended discovery rules are effective as of March 1, 2001. In the case at bar, upon remand, the State and defendant may renew their requests for discovery. In granting any request by the State, the trial court should consider and safeguard defendant's constitutional rights.

JUSTICE GARMAN took no part in the consideration or decision of this case.

### Supplemental Dissent Upon Denial of Rehearing

JUSTICE THOMAS, dissenting:

The supplemental opinion begins:

"At the time of defendant's trial, the supreme court rules did not provide for discovery at a death penalty hearing. [Citation.] Our holding in this case followed the dictates of the rules then in effect. Shortly after this opinion was filed, this court determined that the discovery rules should be extended to death penalty hearings." 196 Ill. 2d at 387-88.

Thus, the supplemental opinion expressly concedes that the original opinion rests upon a premise that no longer is valid. Oddly, however, the supplemental opinion contains not a trace of analysis as to whether the demolition of that premise actually affects the outcome of this case. Because I am convinced that the decision to vacate defendant's death sentence cannot survive the recent amendment to Rule 411, I respectfully dissent from the supplemental opinion.

Effective March 1, 2001, this court amended Supreme Court Rule 411 to state that the supreme court rules

governing discovery in criminal cases *"shall be applied to the separate [capital] sentencing hearing* provided for in section 9—1(d) of the Criminal Code of 1961 (720 ILCS 5/9—(d))." (Emphasis added.) 188 Ill. 2d R. 411. Such rules include Rule 413(e), which provides that:

> "Upon a showing of materiality, and if the request is reasonable, the court in its discretion may require disclosure to the State of relevant material and information ***."
> 134 Ill. 2d R. 413(e).

As the supplemental opinion recognizes, the amended version of Rule 411—and consequently Rule 413(e)—will apply to defendant's new capital sentencing hearing on remand. See 196 Ill. 2d at 389. Thus, the only limitations upon the trial court's authority to enter the identical discovery order on remand are those set forth in Rule 413(e)—*i.e.*, materiality, relevance, and reasonableness.

Now, there is no question that information relating to defendant's mental health is both material and relevant. Indeed, an alleged mental illness formed the cornerstone of defendant's mitigation strategy. Likewise, there is no question that the State's request to have defendant examined by Dr. Markos was reasonable, as defendant waited until his sentencing hearing to first raise a claim of mental illness, and the State is entitled to rebut that claim. See 720 ILCS 5/9—1(e) (West 1998) ("[t]he State *** shall be given fair opportunity to rebut any information received at the hearing"). Thus, assuming that Rule 413(e) applied to defendant's original sentencing hearing, the trial court would not have abused its discretion by ordering defendant to submit to a psychiatric examination by Dr. Markos.

To be sure, the amendment to Rule 411 does not undermine the majority's conclusion that the trial court's original discovery order was improper.[1] See 196 Ill. 2d at

---

[1] A conclusion with which I strongly disagree. See 196 Ill. 2d at 385-87 (Thomas, J., dissenting).

382. An order that was unauthorized when entered remains so, irrespective of any subsequent action by this court. However, the amendment to Rule 411 unquestionably renders that error harmless. As demonstrated above, the trial court's discovery order is perfectly appropriate under Rule 413(e), *which the majority acknowledges will apply on remand.* In other words, a remand will result in a new sentencing hearing at which the trial court may lawfully enter the very order that forms the basis for the remand. And the entry of that order will result in a new jury hearing the very same testimony that was heard by the original jury. I cannot discern—and the supplemental opinion does not even attempt to identify—the prejudice that defendant suffers from the entry of an order that, while improper the first time around, will be proper the second time around.

Given this court's recent amendment to Rule 411, I see no justification for the majority's continued commitment to vacating defendant's death sentence and remanding this cause for a new—and quite possibly identical—sentencing hearing. I therefore respectfully dissent from the supplemental opinion.