NOTICE

Decision filed 04/20/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250290

NO. 5-25-0290

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 21-CF-313 |
| | ) | |
| BRYCE ANDREWS, | ) | Honorable |
| | ) | Neil T. Schroeder, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BOLLINGER delivered the judgment of the court, with opinion.
Justices Vaughan and Hackett concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant, Bryce Andrews, was convicted, after a bench trial, of the offense of first degree murder and other charges related to the deaths of his father and stepfather, Leonard "Jim" Ebrey and Robert "Bob" Andrews. On appeal, defendant asserts that the trial court erred in ordering him to submit to a psychological examination for the purpose of a hearing on his motion to suppress statements given to police on February 5, 2021. The trial court did not err in ordering that psychological examination and thus, for the following reasons, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3    On February 3, 2021, defendant, Bryce Andrews, was indicted with four counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2020)), one count of aggravated arson (*id.* § 20-1.1(a)(1)), one count of offenses relating to motor vehicles (625 ILCS 5/4-103(a)(1) (West 2020)),

1

and two counts of concealment of a homicidal death (720 ILCS 5/9-3.4(a) (West 2020)) related to the deaths of Ebrey and Andrews. Andrews was defendant's father, having adopted him along with his then-wife, Teresa Johanson. Johanson and Andrews had subsequently divorced, and Andrews married Ebrey in 2017. The bodies of Ebrey and Andrews were discovered on February 1, 2021, by first responders who were called out to their home, located at 2301 Wedgewood Drive, Alton, IL, for a fire. The bodies of both victims were found within the home. Officers discovered that defendant had also been living at that address, but he was not located within the home. Defendant was ultimately located by officers at SSM Health DePaul Hospital (DePaul Hospital) on February 4, 2021, having been admitted to that hospital for psychiatric care and then released into police custody on February 5, 2021. Police interviewed defendant about the deaths of Ebrey and Andrews on that date, and he made inconsistent and incriminating statements during that interview.

¶ 4        On March 3, 2023, defendant filed a motion to suppress his statements to police on February 5, 2021. In his motion, defendant alleged that based on his mental health condition or "psychiatric state" at the time of the interview, he was unable to knowingly, intelligently and voluntarily waive his rights and speak to police at that time. Five days after filing his motion to suppress, defendant disclosed a report from Dr. Anita Bazile-Sawyer (Dr. Bazile) regarding defendant's mental health and the waiver of his rights during that February 5, 2021, interview.

¶ 5        On June 22, 2023, the State filed a motion requesting that defendant be ordered to submit to an examination by Dr. Daniel Cuneo, a clinical psychologist. On July 13, 2023, defendant filed a response to the State's motion, objecting to the examination. A hearing was held on the matter on July 19, 2023. During that hearing, the State indicated that, as defendant had hired his own mental health expert, Dr. Bazile, to render an opinion in support of his motion to suppress, the State wished to have its expert, Dr. Cuneo, testify in response. The State further indicated that Dr.

Cuneo was unable to render an opinion without speaking to defendant personally and doing certain examinations. The State cited an earlier, November 9, 2022, order by the trial court allowing Dr. Bazile to interview defendant at the Madison County jail, and argued that, based on that, Dr. Bazile had apparently interviewed defendant as part of rendering her opinion in the matter. The State argued that section 115-6 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-6 (West 2020)), titled "Appointment of Psychiatrist or Clinical Psychologist," applied to the situation, as it allowed a court to order a defendant to submit to an examination by a clinical psychologist or psychiatrist chosen by the State both when he had given notice that he intended to either assert the defense of insanity or intoxicated or drugged condition, or intended to plead guilty but mentally ill, but also when "the facts and circumstances of the case justify a reasonable belief that the aforesaid defenses may be raised." *Id.* The State argued that defendant brought mental defenses up in the case by raising the issue of his mental health in the motion to suppress and had indicated an intent to use "some type of mental defense at trial." The State cited *People v. Comier*, 2020 IL App (1st) 170500, arguing that section 115-6 did not preclude the court from requiring a defendant to submit to a psychological examination in situations not specifically delineated under the statute.

¶ 6     Defendant argued that ordering him to submit to a psychological examination in this situation was a violation of his rights under the fifth amendment to the United States Constitution unless it was under a circumstance specifically delineated by section 115-6. Defendant argued he had not given notice of an intent to use any of the specific defenses delineated under section 115-6 and that a defendant's mental state for the purposes of his ability to waive his *Miranda* (*Miranda v. Arizona*, 384 U.S. 436 (1966)) rights was not one of the exceptions delineated under section 115-6, therefore he should not be ordered to submit to an examination. Defendant asserted the statute only covered trial defenses and the issue for which he would submit his expert's

3

examination, that of whether his statement to police was made after knowingly, intelligently and voluntarily waiving his *Miranda* rights, was entirely separate from potential trial defenses. Defendant distinguished his situation from *Comier* and instead cited *People v. Harlacher*, 262 Ill. App. 3d 1 (1994). Defendant further argued that while Dr. Bazile had spoken to him, it was not for the purposes of the motion to suppress issue and she had not taken that interview into account when rendering her opinion. If Dr. Bazile could render an opinion without utilizing an in-person examination, defendant argued, so too could Dr. Cuneo.

¶ 7 Upon questioning by the trial court during that hearing, defense counsel explicitly stated defendant had no intention of seeking a verdict of not guilty by reason of insanity or guilty but mentally ill in the matter. The trial court then expressed concern about the fundamental fairness of defendant putting forth an expert at a motion to suppress hearing regarding his mental state while refusing the State the opportunity to have its expert examine defendant based on the defense expert's own methodology. The trial court took the matter under advisement and issued a written ruling the following day on July 20, 2023. In that written order, the trial court granted the State's request that defendant be ordered to submit to Dr. Cuneo's examination.

¶ 8 Shortly thereafter, on August 30, 2023, the State tendered a copy of Dr. Cuneo's completed report to defendant. Then, following a motion filed October 25, 2023, by defense counsel requesting a fitness evaluation, defendant was found unfit to stand trial on February 13, 2024. Defendant was found to have been restored to fitness on September 3, 2024. On October 3, 2024, defendant filed an answer to discovery indicating that he might assert the defense of insanity and on November 4, 2024, a hearing on defendant's motion to suppress was held.

¶ 9 The State first called Dr. William Wang, a licensed psychiatrist employed at DePaul Hospital in St. Louis, Missouri, to testify. During his testimony, Dr. Wang testified that he had

4

encountered defendant after he was transferred to DePaul Hospital from St. Louis University Hospital (SLUH) on February 4, 2021, for in-patient psychiatric care. Dr. Wang testified that he examined defendant at that time and prescribed him medication for what Dr. Wang described as "acute psychosis." The medications prescribed included risperidone, an antipsychotic and mood stabilizing medication, albuterol, an asthma medication, and several others prescribed on an as-needed basis, including olanzapine, an antipsychotic, hydroxyzine, an anxiety medication, Thorazine, and zolpidem. Dr. Wang indicated that defendant had been given a relatively low dose of risperidone while at DePaul, one milligram, which Dr. Wang then increased to three milligrams daily, also a low dose, on his second day of treatment. Dr. Wang described defendant as responding well to the medication, showing improvement by no longer responding to internal stimuli, no longer appearing to hallucinate, and displaying more coherent thoughts. When spoken to after being given risperidone, defendant was able to have a linear conversation and respond appropriately to questions.

¶ 10    The following day, February 5, 2021, Dr. Wang discharged defendant as "fit for confinement," which he described as meaning that defendant was not in imminent danger, imminently suicidal, or imminently homicidal and his psychosis had stabilized enough that he could be released to a jail environment where he would be watched and given reasonable medical care, including medication. Dr. Wang testified that at the time he made the determination that defendant was fit for confinement, defendant was not hallucinating, had no paranoid ideations, was communicating appropriately, and was oriented to place, people, and time. Dr. Wang could not say definitively whether defendant was malingering about any or all of his symptoms, which he defined as something that occurred when a patient might have some external motivation or benefit to present with false symptoms.

5

¶ 11    Upon cross-examination, Dr. Wang clarified that he would have noted in his records that defendant was malingering if he had a suspicion of such, and he would not have prescribed antipsychotic medications to defendant if he believed defendant's symptoms were "pure malingering." He clarified that his own diagnosis of defendant was psychotic disorder based on the definition in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, and is termed unspecified schizophrenia spectrum disorder or other psychotic disorder in the fifth edition. He defined either condition as being psychotic symptoms without knowing why they were occurring or how long they had been occurring. Dr. Wang described the potential side-effects of both risperidone and olanzapine as sedation and muscle tremors, with risperidone being more likely to cause muscular symptoms. He also indicated that when a patient came in severely psychotic and then symptoms resolved quickly, that could indicate that the symptoms were substance-induced. Dr. Wang could not be sure whether that was what had occurred with defendant.

¶ 12    The State next called Lieutenant James Siatos of the Alton Police Department. He testified that he was a member of a unit called the Major Case Squad and had been assigned, through that unit, to investigate the murders of Ebey and Andrews. Lieutenant Siatos testified that after the bodies of Ebrey and Andrews were found in their home, officers learned that defendant had been living with Ebrey and Andrews. Officers began looking for defendant eventually locating him at DePaul Hospital. Lieutenant Siatos testified that officers were not allowed to question defendant when they first located him at the hospital and instead had to wait until he was released to police custody on February 5, 2021. Lieutenant Siatos testified that he and Sergeant Cade Koelker began interviewing defendant on that same date around 11:10 a.m.

¶ 13    Lieutenant Siatos described the interview as being overall nonconfrontational and stated that neither he nor Sergeant Koelker used any deceptive tactics on defendant. He also indicated that defendant was provided food and water during the interview. He stated that Sergeant Koelker was the primary officer questioning defendant, and they learned some basic information about defendant during the interview. Defendant also provided an address, although it was not the address officers had known him to be most recently residing at, that of Ebrey and Andrews. Defendant was given a form with his *Miranda* rights listed on them and asked to read them aloud to the officers, which he did. Defendant was asked to initial and sign the form and refused, though he indicated that he understood his *Miranda* rights. Lieutenant Siatos and Sergeant Koelker then asked him about the murders of Ebrey and Andrews. Lieutenant Siatos stated that over the course of the interview, defendant gave multiple accounts of the murders and also made some inconsistent statements, including regarding his most recent phone number and the phone he smashed after the murders. He also testified that defendant was able to respond logically to questions, ask for clarification about questions he did not understand, and overall made sense with no indications of delusional or psychotic behavior. The interview ended when defendant said he was "done."

¶ 14    Upon cross-examination, Lieutenant Siatos admitted that defendant had stated during the interview that on the date of the murders, he was "hearing voices" and that those voices told him to commit the murders. He also admitted that defendant told officers that he felt like he was "losing his mind." Lieutenant Siatos testified that he could not recall whether Sergeant Koelker asked defendant whether he was under the influence of any drugs or alcohol during the interview.

¶ 15    Sergeant Koelker was next called to testify. He testified that he interviewed defendant along with Lieutenant Siatos, but his direct examination testimony largely focused instead on a later interview with defendant on February 10, 2021, at the Madison County jail. On that date, he

executed a search warrant for a buccal swab from defendant and also went through defendant's *Miranda* rights with him again, prior to speaking with defendant as defendant had requested. Sergeant Koelker testified that defendant read the *Miranda* form out loud to himself with apparent ease and indicated he understood his rights, although defendant declined to speak with Sergeant Koelker without his attorney. A video recording of that interview was placed into evidence.

¶ 16    On cross-examination, questioning instead focused on the February 5, 2021, interview at issue in the hearing and the circumstances surrounding defendant's release into police custody. Sergeant Koelker testified that he did not always ask about whether a person was under the influence of drugs or alcohol at the time of interrogations, indicating he generally only asked if it appeared that someone might be under the influence based on their actions and demeanor. With regard to defendant's interview, Sergeant Koelker testified that he had not been aware that defendant was on antipsychotic medications at the time of the February 5, 2021, interview and he had not asked if he was on any medication during that interview as, "I didn't necessarily feel it was a question to be asked. I had no reason to think that he wasn't fit for confinement or anything like that. That was the doctor's orders. He was released to our care." Sergeant Koelker also acknowledged that when he asked defendant to read his *Miranda* rights aloud during the interview, he had to repeat that request twice before defendant began reading them aloud.

¶ 17    During redirect examination Sergeant Koelker testified that during the February 5, 2021, interview, defendant appeared to be able to follow the conversation, made statements that matched with evidence police had located, and logically answered questions. Then, during the February 10, 2021, interview, defendant appeared to be familiar with his *Miranda* rights based on the prior interview and agreed that defendant had "rattled them right off" before he could start giving them.

¶ 18    After Sergeant Koelker's testimony, the State argued it had met its *prima facie* burden and the burden had shifted to defendant. The trial court agreed, and defendant called his sole witness, Dr. Bazile.

¶ 19    Dr. Bazile testified she had been a clinical and forensic psychologist for over 23 years. She indicated that in forming her opinion about defendant's ability to knowingly, intelligently, and voluntarily waive *Miranda*, she reviewed the medical records from SLUH and DePaul Hospital, as well as video from the February 5, 2021, interrogation itself. She further stated that while she had spoken to defendant, that was not taken into consideration in forming her opinion regarding defendant's ability to waive *Miranda*. She indicated that she did not believe that defendant's mental state at the time of any examination or interview performed by a professional after February 5, 2021, would necessarily be indicative of his mental state on February 5, 2021, and that the best information to rely on was the reports and video she had based her opinion on.

¶ 20    Dr. Bazile testified that of particular note to her in the items she reviewed were the way that defendant presented to the SLUH emergency room, documentation of his mental state during his stay there and at DePaul Hospital, the treatment he was provided, and his psychiatric evaluations from that time period. Dr. Bazile also found it noteworthy that defendant had been involuntarily committed, as that process was reserved, by Missouri statute, for what she described as "severe mental illness." In looking, specifically, at the medications defendant was given, Dr. Bazile noted that defendant was being given antipsychotics, risperidone specifically. She overall found the medications defendant was prescribed as the result of his mental health symptoms to be usual and noted that, while it varied between individuals, generally, in her experience, the medications defendant was on would cause sedation. Dr. Bazile noted no evidence that anyone at SLUH or DePaul Hospital thought defendant was malingering. Overall, Dr. Bazile considered

9

there to be notable consistency across defendant's mental health providers at both hospitals as to his overall behavior—that being that he was experiencing acute psychosis or was out of touch with reality.

¶ 21 With regard to the interview of defendant itself, Dr. Bazile observed from the video recording several behaviors of note from defendant. Defendant appeared lethargic, in particular while he was waiting for police to enter the room to speak with him. Dr. Bazile described defendant as looking up into the air and blinking as well as looking from side to side in the middle of conversation in ways that were unusual and may have indicated that he was experiencing hallucinations or otherwise responding to some kind of internal or external stimuli. Defendant also verbalized confusion during the interview and appeared to have what Dr. Bazile characterized as difficulty responding to questions, which she classified as indicative of delayed thinking processes. She characterized him as sometimes jumping to topics unrelated to the ones being asked about, having trouble tracking the conversation happening in terms of who was speaking, and at times laughing inappropriately.

¶ 22 Dr. Bazile rendered the opinion that at the time of the February 5, 2021, interview, defendant did not have the mental capacity to "understand the gravity of the situation without the interference of psychiatric problems" and that his ability to understand was impaired by his mental health condition. She opined that he did not have the ability to knowingly, voluntarily, and willingly waive his *Miranda* rights. She believed that he could read the rights and state understanding, but that actual understanding eluded him at that time based on his mental condition.

¶ 23 During cross-examination, counsel for the State noted that, during her testimony, Dr. Bazile had "looked up" while answering a question and questioned whether it was possible that looking up was a sign of thinking as opposed to hallucination. Dr. Bazile admitted that thinking

10

was a possible explanation for looking up, as counsel had described her to be doing. Dr. Bazile also testified that she reviewed defendant's records from the Missouri Department of Corrections, which indicated that he lied about being suicidal while incarcerated there for better housing, although she did not put that in her report as she did not consider it clinically relevant at the time she wrote her report. While Dr. Bazile again noted that no one who treated defendant at SLUH or DePaul Hospital had suspected him of malingering, she admitted that she did not know herself whether he might have been. Dr. Bazile also testified that she had never before independently evaluated someone to determine whether or not they had "appropriately waived" their *Miranda* rights, although she indicated she was aware of the legal standard applicable to the evaluation. There was also lengthy questioning of Dr. Bazile about the appropriateness of rendering an opinion about defendant's ability to waive *Miranda* without having interviewed him for that purpose under the applicable ethical rules for psychologists.

¶ 24   The trial court then ruled that the burden had shifted back to the State, who called Dr. Cuneo as a witness. Dr. Cuneo testified that he helped develop the *Miranda* rights form utilized in St. Clair County, which was, wording-wise, the same one utilized in this case. He testified that form was designed for a fifth grade reading level and was broken down into "one thought per utterance" so that an individual could understand it. Dr. Cuneo testified that people with IQs as low as 70 had shown the ability to understand the form. Dr. Cuneo testified that in evaluating whether someone knowingly, intelligently, and voluntarily waived *Miranda*, he liked to have some idea of the person's intelligence, as he most often saw the issue come up when someone had "limited intellectual abilities" as opposed to due solely to psychosis. As a result, in making his evaluation on that subject, Dr. Cuneo testified that he would ask for a subject's school records, including those of any individual education plans, and do a mental status exam, testing of IQ via

11

the Quick Test by Ammons and Ammons, and testing of academic skills via the Wide Range Achievement Test. The administration of the mental status exam, IQ Quick Test, and Wide Range Achievement test all required an in-person meeting, and Dr. Cuneo testified that in this case he also utilized that meeting to see whether defendant displayed mental illness at the current time as well. The Quick Test showed defendant to have an IQ of 82, and the Wide Range Achievement Test showed him to be able to read at a ninth grade level. Dr. Cuneo opined that, based on an IQ of 82, assuming no other difficulties, defendant should not have had difficulty understanding his *Miranda* rights.

¶ 25 The mental status exam showed defendant to be oriented to person and place. During the in-person interview defendant showed no signs of hallucinations and denied previous hallucinations, indicating that they only happened in his sleep because of drug use, which was in apparent contradiction to his presentation at SLUH and DePaul Hospital. Defendant did not show signs of delusions, although his thinking did have a "paranoid flavor" to it. Defendant also showed goal directed, linear, nontangential thinking without any apparent trouble comprehending questions. Overall, Dr. Cuneo did not detect what he termed as "schizophrenic thinking" from defendant during his in-person meeting. Dr. Cuneo did diagnose defendant as having persistent depressive disorder and post-traumatic stress disorder. At the time of the meeting, defendant was not taking any medications and, during it, defendant denied having received mental health treatment prior to February 2021.

¶ 26 Prior to meeting with defendant, Dr. Cuneo testified that he reviewed the video of the February 5, 2021, interview, as well as a separate, pure audio recording of that same interview. He also reviewed defendant's criminal history, some Missouri police reports, the DePaul Hospital records, the SLUH records, and Dr. Bazile's report. Subsequent to the meeting, Dr. Cuneo testified

that he interviewed jail staff and looked at defendant's clinical records from the jail to see what medications he was prescribed and whether defendant had been compliant with medication. He also reviewed defendant's Missouri DOC records, but not until after he authored his report, as he did not receive them prior to writing it. However, Dr. Cuneo did note that defendant's Missouri DOC records documented an incident from December 18, 2019, where defendant claimed to be hearing voices and having related suicidal ideation, which caused a change in his housing within DOC that he did not like, at which point he denied the hallucinations. Dr. Cuneo testified that the incident appeared to show "a certain amount of manipulation."

¶ 27    Dr. Cuneo testified that he did not believe that defendant's mental illness substantially impaired his ability to knowingly, intelligently, and voluntarily waive his *Miranda* rights. He summarized the basis for that opinion as involving several things. First, Dr. Cuneo cited that defendant denied experiencing hallucinations at the time of his February 5, 2021, interview and asserted that he was not delusional at the time of that interview. Dr. Cuneo indicated that, on top of those factors, defendant possessed the ability to read his *Miranda* rights and to explain them back to Dr. Cuneo. Defendant also had no psychotic diagnosis. Overall, Dr. Cuneo testified that, while defendant was mentally ill, mental illness did not impair his ability to waive his *Miranda* rights on February 5, 2021.

¶ 28    Upon cross-examination, Dr. Cuneo agreed that none of the physicians treating defendant during February of 2021 made any reference to the possibility that defendant might be feigning mental illness. Defense counsel also pointed out that the meeting with defendant (and the tests and examinations administered during it) did not occur in February 2021, but instead well after, in August 2023.

13

¶ 29  After arguments by both the State and defense, the trial court issued a written order on November 27, 2024. In that order, the trial court denied defendant's motion to suppress the February 5, 2021, interview, finding that defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights. In rendering that decision, the trial court stated that it found the testimony of Drs. Wang and Cuneo "particularly informative." The trial court cited Dr. Wang's testimony that, upon discharge from DePaul Hospital, defendant was not exhibiting suicidal, homicidal, or paranoid ideation, was not experiencing hallucinations, was oriented to place, person and time, was not suffering from active psychosis, and was communicating appropriately. The trial court further noted Dr. Cuneo's "extensive experience" in the areas of both fitness to stand trial and capacity to waive *Miranda* rights. It cited Dr. Cuneo's opinion that defendant's mental illness did not substantially impair his ability to waive his *Miranda* rights and the basis for that opinion, which included that defendant had an IQ of 82 and a ninth grade reading level, as well as Dr. Cuneo's extensive review of all the records, video, and other relevant materials in the case.

¶ 30  Subsequently, defendant waived his right to a jury trial and on February 14, 2025, the matter proceeded to a bench trial. During the trial, defendant did not contest having killed Ebrey and Andrews in their home. Instead, the sole defense presented was that of insanity, with defense counsel arguing that at the time of the murders defendant was suffering from "delusions, hallucinations, [and] command auditory hallucinations" that left him without the capacity to appreciate the criminality of his conduct.

¶ 31  In its case-in-chief, the State established that on February 1, 2021, police officers and firefighters were called out to 2301 Wedgewood Drive in Godfrey, Madison County, Illinois, for an active house fire. Firefighters quenched the blaze, and police officers spoke to neighbors to find out who lived at the residence, learning that victims Ebrey and Andrews lived at the residence

14

along with defendant. Within the residence, the body of Ebrey was found on the enclosed rear porch of the residence along with a red gas can and the body of Andrews was found in a bedroom where the floor had partially collapsed into another bedroom in the basement below. The bodies of both men showed signs of damage from the fire as well as lacerations and stab wounds. In the backyard of the residence, a shovel with what was later identified as blood was found sticking into the ground beside what appeared to be an attempt to dig a grave.

¶ 32    An investigation by Fire Marshal Gregory Vespa determined that the fire had been intentionally set, with the fire originating in two separate spots in the house, the back porch and the basement. Autopsies of both Ebrey and Andrews revealed that neither died in the house fire. Instead, the cause of death for Ebrey was determined to be stab wounds to the chest, with Ebrey having sustained a total of 26 stab wounds. Andrews' cause of death was stab wounds to the neck, chest, and abdomen. He sustained a total of 53 stab wounds.

¶ 33    Defendant was not found within the 2301 Wedgewood house on February 1, 2021, and one of the two vehicles owned by the victims was missing. Officers attempted to find defendant and were eventually able to locate him at DePaul Hospital, where he was eventually taken into custody and interviewed by Sergeant Koelker. Defendant had first gone to SLUH on February 3, 2021, for treatment of injuries to his hand and was then transferred to DePaul Hospital for inpatient mental health treatment. When first presenting to SLUH for treatment, defendant indicated he neither remembered his name nor how his hand had been injured.

¶ 34    Prior to presenting at SLUH, on February 2, 2021, defendant went to the St. Patrick Center, a charitable operation run by Catholic Charities, where he met with Christopher Bridgs, who had given him new clothing. Bridgs noticed that defendant appeared to be injured, noticing blood on his hand. Bridgs offered to call defendant an ambulance, but he declined. Video without audio of

15

defendant's interactions with Bridgs was entered into evidence. During cross-examination, Bridgs testified that during his encounter with defendant, he observed defendant to have "weird eyes."

¶ 35 As part of attempting to locate defendant, Andrew and Ebrey's missing vehicle was tracked. Officers were able to use license plate readers to find out that the vehicle had traveled across the state line from Illinois to St. Louis, Missouri, via the McKinley Bridge. The vehicle was discovered abandoned off of an alley in the "west end" of St. Louis. The vehicle was parked in an area of overgrowth, near several abandoned buildings with a mattress placed on top of it in an apparent attempt to further hide it from view. Video that officers obtained from a nearby residence showed a figured taking a garbage bag away from the vehicle and then what seemed to be the same figure returning in different clothing. That figure could be seen at one point placing a mattress over the top of the vehicle. Blood that matched defendant's DNA profile was found at various places on the vehicle. A broken phone was found near the vehicle as well, along with another part of what appeared to be the same phone in a nearby dumpster.

¶ 36 Video of defendant's interview with Sergeant Koelker was admitted into evidence. During the interview, which occurred on February 5, 2021, and had been the subject of the previous motion to suppress, defendant gave multiple accounts of how he had come to stab Ebrey and Andrews to death, first indicating that there was an argument and then later stating that there was no argument and that he simply stabbed them until they died while they lay in bed. Defendant said that he used a knife, which he later discarded, during the murders. Defendant was unable to indicate where he discarded the knife, and it was never recovered. Defendant also stated that at one point that he was shot in the hand by one of the victims during the altercation, but his hands appeared to have sustained wounds from a sharp object rather than a gunshot, and no gun was ever recovered. Defendant originally indicated he did not have a phone and stated that his mother's phone number,

16

which he did not know, was the last good phone number he had, although he later admitted to destroying his phone. During that interview, defendant claimed at one point to have been hearing voices at the time of the murders.

¶ 37    A recording of a jail call defendant had with his sister, Bridgette Andrews, made on May 26, 2021, was also entered into evidence and played. In that recording, defendant admitted to stabbing victims Ebrey and Andrews to death and again claimed to have been hallucinating and having delusions at the time of the murders. Defendant also claimed during the call that his biological mother suffered from schizophrenia and indicated that he would be pleading insanity. Defendant again claimed during that call to have been shot during the altercation.

¶ 38    Defendant then presented his own case, calling two witnesses: registered nurse Natalie Morris, who was defendant's nurse while at DePaul Hospital on February 4-5, 2021, and Dr. Jeremy Jewell, who evaluated defendant for fitness. Dr. Jewell was qualified as an expert in the field of clinical psychology as part of his testimony. A stipulation with regard to the testimony of Dr. Wang, defendant's treating psychiatrist at DePaul Hospital, was also presented. That stipulation included a transcript of Dr. Wang's testimony from the motion to suppress hearing.

¶ 39    Morris indicated that she had performed the admission assessment for defendant upon his arrival at DePaul Hospital. During that assessment, defendant denied suicidal ideation but also reported having experienced command auditory hallucinations telling him to hurt himself on the ambulance ride from SLUH to DePaul Hospital. Defendant also denied homicidal ideation and initially denied both audio and visual hallucinations as well. Defendant indicated he had not been taking any medications prior to his hospitalization. Morris found defendant's affect to be anxious, guarded, flat, distracted, blunted, and preoccupied. His thought process was preoccupied and paranoid and showed poor concentration.

17

¶ 40    Dr. Jewell testified that he evaluated defendant for fitness on December 12, 2023, and diagnosed him as having schizoaffective disorder at that time, as well as opiate use disorder. Dr. Jewell described schizoaffective disorder as the "intersection" between experiencing a mood disorder and psychotic features. In making that diagnosis, Dr. Jewell testified he had the benefit of defendant's records from SLUH, DePaul Hospital, the reports from Dr. Cuneo and Dr. Bazile regarding *Miranda* waiver, and his own interview with defendant, which included some testing. At the time of Dr. Jewell's interview, he indicated defendant was not taking his prescribed medications. During that interview, Dr. Jewell described defendant's affect as inappropriate to the topic of conversation, changing from irritability to laughter unexpectedly, and tangential, otherwise referred to as derailment. Defendant's psychological functioning was described as tangential, difficult to redirect, and at times incoherent. Dr. Jewell also described a conversation that took place during the evaluation that reflected "a state of psychosis where he doesn't understand who he is or how the world works in reality." During that conversation, defendant mentioned an alleged son named Jasaiah, then expressed confusion about whether he and Jasaiah were the same person. Dr. Jewell also testified that defendant made other statements reflecting psychosis, such as referring to a correctional officer and inmate walking past as his "biological specimens" and at times questioning the way people would measure time and its meaning. Defendant also spoke of hallucinations. Defendant also exhibited signs of what Dr. Jewell described as mania. Dr. Jewell indicated he did not note any signs of malingering from defendant, nor did he believe defendant to be malingering. Dr. Jewell noted he did not see what he considered to be normal signs of malingering from defendant, even when he probed for malingering. Upon cross-examination, Dr. Jewell clarified that he had only examined defendant for fitness, not for insanity, and was unaware of what defendant's mental status might have been on February 1, 2021.

18

¶ 41    The defense then rested, and Dr. Cuneo was called an expert witness by the State in rebuttal to testify about defendant's sanity at the time of the murders of Ebrey and Andrews. Dr. Cuneo testified that he met with defendant on January 29 and 31, 2025, to make his evaluation for insanity. In developing his opinion, Dr. Cuneo testified that he took into account the two interviews in January 2025, his previous interview in 2023 for the purposes of defendant waiving *Miranda*, police reports, defendant's video recorded statements, recorded telephone conversations, hospital records, records related to defendant's fitness, and jail records. Dr. Cuneo indicated that when he wrote the report detailing his findings, he had not seen Dr. Jewell's report but did later get the opportunity to see it and had reviewed it prior to his testimony.

¶ 42    As part of his testimony, Dr. Cuneo noted contradictions between his meetings with defendant in January 2025 and in 2023. Specifically, Dr. Cuneo noted that in 2023 defendant denied having hallucinations and opined that at the time of that 2023 interview, defendant was contemplating proceeding *pro se* and "did not want to look like he was acutely psychotic at that time." By contrast, Dr. Cuneo indicated that in the January 2025 interviews, defendant stated that he had been experiencing hallucinations at the time of the murders and that voices were telling him that if he did not kill, he could not eat. Defendant explained that the hallucinations began at Farmington Correctional Center, but records from that facility did not reflect him having hallucinations while there. Instead, the first documentation of any hallucinations by defendant were from after the murders. That was also the first time that defendant was given any mental health treatment. During the January 2025 interviews, Dr. Cuneo testified that he tested defendant for malingering. He detailed one of these tests, stating he told defendant, falsely, that individuals who "are truly sick" would experience visual hallucinations, usually of animals, in addition to auditory ones, at which point defendant reported having seen a duck in his cell. Dr. Cuneo also

19

noted that, in addition to the alacrity with which defendant was returned to fitness after being treated at Chester Mental Health, the report of a Dr. Jennings related to defendant's fitness noted defendant as having over-endorsed his symptoms upon arrival at Chester Mental Health.

¶ 43    Dr. Cuneo described defendant as not displaying any delusions in January 2025 and that his thought process was linear and not tangential, which was not consistent with a diagnosis of schizophrenia or schizoaffective disorder. In contrast to defendant's description to Dr. Jewell of his relationship with his father, Andrews, as being very good and Andrews spoiling him, defendant told Dr. Cuneo that he had been sexually abused by Andrews. At other times, defendant denied being sexually abused. Dr. Cuneo noted that defendant also denied being sexually abused by Andrews in the May 2021 jail call with his sister and instead indicated potential sexual abuse by a person named Jerry, who had abused other members of the family. However, at other times defendant denied ever being sexually abused at all. Defendant told Dr. Cuneo that he burned the victims because they were homosexual and he believed that this act would purify them. Dr. Jennings's report also noted defendant as having antisocial personality traits, such as sociopathic, psychopathic, or manipulative ones.

¶ 44    Dr. Cuneo indicated that, based on all of the information he had about defendant's prior lack of hallucinations and the behavior he displayed at SLUH and DePaul Hospital, it appeared that, at that time, defendant was suffering from acute stress disorder. Dr. Cuneo described acute stress disorder as occurring when an individual undergoes, sees, or is involved in "extreme trauma" and then manifesting as a short period of "depersonalization" afterward, in which they might become paranoid or not know what was going on around them due to shock. Dr. Cuneo diagnosed defendant as suffering from persistent depressive disorder and unspecified personality disorder, which he described as defendant having "personality difficulty," such as manipulation or antisocial

20

traits, but without meeting the criteria for any specific personality disorder. Dr. Cuneo considered that defendant might suffer from post-traumatic stress disorder but ultimately determined that he did not have the requisite information to definitively diagnose the disorder because of defendant's inconsistent statements about prior sexual abuse. Diagnoses of unspecified schizophrenia spectrum and other psychotic disorders were ruled out. Dr. Cuneo testified that he did not believe that any of defendant's mental illnesses substantially impaired his ability to appreciate the criminality of his conduct. In forming that opinion, Dr. Cuneo indicated that in his opinion, defendant was neither delusional nor hallucinating at the time of the murders. Dr. Cuneo regarded defendant's accounts of hallucinations as "rather suspect at best, outright malingering at worst."

¶ 45     Upon cross-examination, Dr. Cuneo immediately volunteered that while he did not believe defendant met the legal standard for insanity, he believed that he qualified as guilty but mentally ill. Dr. Cuneo also clarified that his earlier 2023 interview with defendant did not focus on the murders themselves, as that interview and evaluation were solely focused on defendant's ability to waive *Miranda*. Dr. Cuneo also acknowledged that other mental health professionals had diagnosed defendant differently than he had, diagnosing him with psychotic disorder and schizoaffective disorder, among other things.

¶ 46     Closing arguments for both sides largely centered on whether defendant was not guilty by reason of insanity. The State pointed to defendant's attempts to cover up the offense and dispose of evidence and Dr. Cuneo's testimony to argue that defendant had not met his burden for the defense of insanity. Defense counsel argued that defendant was suffering at the time of the offense from an undiagnosed psychotic disorder and that, due to that condition, he was unable to appreciate the criminality of his conduct such that he was not guilty by reason of insanity. Defense counsel pointed to defendant's own accounts of hallucinations and the accounts of his condition by Dr.

21

Wang, Dr. Jewell, Dr. Mason, and nurse Morris. He argued that the difference between those accounts and the expert opinion of Dr. Cuneo was that Dr. Cuneo had always interviewed defendant while he was medicated, when he had not been at the time of the murders. In rebuttal, the State pointed out that defendant had offered no expert testimony of his own stating that he was not guilty by reason of insanity.

¶ 47　　The trial court took the matter under advisement and then announced its verdict in open court on February 24, 2025. The trial court found beyond a reasonable doubt that defendant had committed the acts that resulted in the deaths of Ebrey and Andrews, noting that the evidence on that point was overwhelming and largely uncontested. The trial court then turned to the question of whether defendant was not guilty by reason of insanity. With regard to the issue of defendant's sanity at the time of the murders, the trial court found the assessments and diagnoses from SLUH and DePaul Hospital "to be of limited value," noting that those physicians had limited information about defendant's mental and social history. The trial court specifically noted that they had no knowledge of defendant's involvement in two murders and his efforts to avoid culpability after the commission of those murders. The trial court also noted that Dr. Jewell's examination took place years after the deaths of Ebrey and Andrews and was for the purpose of fitness rather than sanity. It further noted that only Dr. Cuneo, whom it described as having extensive experience and qualifications in the field of forensic psychology, actually offered an opinion as to defendant's sanity at the time of the murders. The court specified that it found Dr. Cuneo's opinion to be persuasive and credible. The trial court found that defendant had not met his burden of proving the defense of insanity by clear and convincing evidence and then found defendant guilty but mentally ill as to all charged offenses. Defendant was then sentenced on April 8, 2025. The trial court found that some of the charges of which defendant stood convicted were subject to merger or one-act

22

one-crime prohibitions and sentenced defendant to natural life as to both murders, 5 years for concealment of a homicidal death, 10 years for residential arson, and 5 years for offenses relating to a motor vehicle. Each of those sentences were ordered to run consecutive to one another, with the exception of the sentences for residential arson and offenses related to a motor vehicle running concurrently to one another. This appeal followed.

¶ 48                                    II. ANALYSIS

¶ 49     Defendant's sole claim of error on appeal is that the trial court erred when it ordered him to submit to a psychological or mental health examination by the State's expert, Dr. Cuneo, in advance of and for the purposes of the hearing on his motion to suppress. Defendant argues that section 115-6 (725 ILCS 5/115-6 (West 2020)) does not authorize the court to order a defendant to submit to such an examination for the purposes of a motion to suppress hearing, even where the issue of defendant's mental health is at play. Instead, defendant asserts that, by its plain language, section 115-6 only authorizes such an examination when a defendant has raised the defenses of insanity or intoxicated or drugged condition or intends to plead guilty but mentally ill. Defendant thus argues that the trial court had no authority to order Dr. Cuneo's initial examination and cites *Harlacher*, 262 Ill. App. 3d 1, in support of that assertion. Defendant further asserts that he was prejudiced by this error both in the motion to suppress hearing and then at trial.

¶ 50     The State counters that section 115-6 does allow for a psychological examination in defendant's case, as the statute also provides for such an examination not only when defendant has explicitly raised one of the defenses at issue, but also when "the facts and circumstances of the case justify a reasonable belief that the aforesaid defenses may be raised." The State argues that this language applied in this case, pointing out that defendant eventually did pursue the defense of insanity. The State asserts that the facts of this case made it clear from nearly the outset that

23

insanity was the only viable defense available. The State further contends that section 115-6 explicitly provides for situations in which a court is required to order a defendant to submit to a psychological examination by an expert of the State's choosing and does not expressly prohibit ordering such an examination where the terms of the statute are not explicitly met. In support of this contention, the State cites *Comier*, 2020 IL App (1st) 170500. The State also challenges defendant's assertion that he was prejudiced at the suppression hearing and at trial by the trial court's order. The State asserts that defendant's statements to police would not have been suppressed even without the benefit of Dr. Cuneo's testimony and that, likewise, defendant would not have succeeded in proving the defense of insanity even without the State presenting that same expert's testimony.

¶ 51    Initially, we note that the parties disagree somewhat on the standard of review that this court should apply. Defendant asserts that the standard of review is *de novo*, as he asserts the questions pertinent to this case are entirely questions of law as they center on the interpretation of statute, specifically section 115-6. The State agrees that issues of statutory construction are reviewed *de novo* but argues that this case instead concerns itself primarily with whether certain evidence was properly admitted and thus asserts those issues are subject to abuse of discretion review. We agree with both parties that statutory interpretation is a question of law subject to *de novo* review, and thus our examination of whether section 115-6 allowed for or prohibited the trial court to order defendant to submit to a psychological examination will be undertaken *de novo*. *People v. Butler*, 2025 IL 130988, ¶ 31. However, we also find, based on our review of *Harlacher* and *Comier*, that the issue of whether the trial court erred in ordering defendant to submit to a psychological examination is subject to abuse of discretion review. *Harlacher*, 262 Ill. App. 3d at 6, 8; *Comier*, 2020 IL App (1st) 170500, ¶¶ 51-52.

24

¶ 52    Section 115-6 reads, in relevant part, as follows:

> "If the defendant has given notice that he may rely upon the defense of insanity as defined
> in Section 6-2 of the Criminal Code of 2012 or the defendant indicates that he intends to
> plead guilty but mentally ill or the defense of intoxicated or drugged condition as defined
> in Section 6-3 of the Criminal Code of 2012 or if the facts and circumstances of the case
> justify a reasonable belief that the aforesaid defenses may be raised, the Court shall, on
> motion of the State, order the defendant to submit to examination by at least one clinical
> psychologist or psychiatrist, to be named by the prosecuting attorney." 725 ILCS 5/115-6
> (West 2020).

The parties in this matter point primarily to two cases, *Harlacher* and *Comier*, for guidance with
regard to how section 115-6 should be read and specifically whether it allowed the trial court to
order defendant to submit to a psychological examination by the State's expert. In looking at those
cases, this court also found *Comier*'s examination of the Illinois Supreme Court's decision in
*People v. Lee*, 196 Ill. 2d 368 (2001), to be potentially relevant to the issues at bar as well. As
such, we take up each of these cases in the order of their publication.

¶ 53    In *Harlacher*, the defendant was charged with two counts of aggravated criminal sexual
abuse and one count of armed violence. 262 Ill. App. 3d at 2. After his victim, his stepdaughter,
told one of her friends of his crimes, the defendant was questioned by police and made a written
statement. *Id.* at 3-4. Subsequent to making that written statement, the defendant's wife took him
to a hospital due to the fact that the defendant was distraught and crying. *Id.* at 4. Based on the
examination of a doctor at that hospital, the defendant filed a motion to suppress his written
statement to police. *Id.* A hearing on that motion was held and denied, although the Second District
noted, with apparent disapproval, that the trial court made no finding regarding the voluntariness

25

of the statement. *Id.* at 4-5. At trial, the defendant wished to present evidence relating to the voluntariness of his written statement to police and was ordered to submit to a psychological examination under section 115-6. *Id.* However, when the defendant declined to submit to the psychological evaluation ordered by the trial court, it barred the admission of all of the evidence the defendant wished to admit regarding the voluntariness of his written statement, specifically (1) the defendant's voluntary admission to the psychiatric ward of a local hospital the day after his statement to police, (2) evidence that the victim's father and stepmother were prominent members of the local legal community, (3) that the defendant's wife had an alcohol problem, and (4) testimony by expert psychological witnesses regarding the defendant's susceptibility to suggestion at the time of his statement to police. The Second District reversed the defendant's convictions and remanded the case for a new trial, finding that the trial court had abused its discretion in barring that evidence. *Id.* at 5-8. In doing so, the Second District found that the trial court was operating under the erroneous belief that "if the defendant was to bring in *any* evidence of mental state, then he must be subjected to a section 115-6 hearing." (Emphasis in original.) *Id.* at 7. The Second District further ruled that section 115-6 only required a psychological examination where insanity, a plea of guilty but mentally ill, or the defense of intoxicated or drugged condition were at issue and that, as none were at issue, section 115-6 did not require the defendant to submit to a psychological examination. *Id.* at 7-8.

¶ 54    In *Lee*, the defendant was convicted after a bench trial of the murder of a police officer during a traffic stop. 196 Ill. 2d at 370-71. The State pursued the death penalty, and a jury was brought in for both phases of the death penalty hearing. *Id.* Prior to the death penalty hearing, the State filed a motion requesting that defendant be ordered to disclose any expert opinions regarding the defendant's mental health status at the time of the murder and that the defendant also be ordered

26

to submit to an examination by a psychiatrist retained by the State. *Id.* at 373. The defendant objected, and initially the trial court denied the State's requests, reasoning that the death penalty hearing was a sentencing hearing which afforded neither the defendant nor the State a right to discovery. *Id.* at 373-74. During the death penalty hearing, defense counsel suggested that the defendant was mentally ill at the time of the murder and informed the jury that experts would testify as to the defendant's mental illness. *Id.* at 375. The State subsequently renewed its request to have the defendant examined by its retained psychiatrist and the trial court granted the State's request. *Id.* at 375-76. During the death penalty hearing, jurors heard from the defendant's experts regarding the defendant's mental health and then, in rebuttal, from the State's expert, who contradicted the defendant's experts. *Id.* at 376-80. Ultimately the jury imposed the death penalty. *Id.* at 372. The Illinois Supreme Court determined both that the testimony of the State's expert was critical and that the trial court had exceeded its authority in requiring the defendant to submit to examination by that expert. *Id.* at 380. The supreme court ruled, specifically, and based in part on the concession of the State on appeal, that section 115-6 did not authorize the examination, as the defendant never raised any of the defenses implicated by section 115-6. *Id.* at 380-81. Furthermore, the supreme court ruled that supreme court rules did not apply to death penalty hearings and that there was no statute or rule authorizing the trial court to order that the defendant submit to examination by the State's expert. *Id.* at 381-82. As the State's expert witness gave critical testimony, the supreme court found that the defendant was prejudiced and the matter was remanded for a new death penalty hearing. *Id.* at 382-84.

¶ 55    Finally, in *Comier*, the most recent and lengthiest of the three decisions, the defendant was convicted of several murders related to the arson of an apartment building. 2020 IL App (1st) 170500, ¶¶ 1-2. Defendant sought to present at trial the testimony of an expert who indicated that

defendant's mental health disorders might have effected the accuracy of statements he made to his co-defendant's girlfriend, who at the time was wearing a recording device pursuant to an eavesdropping order. *Id.* ¶¶ 3-4. In response, the State sought to have the defendant submit to an examination with an expert of their hiring. *Id.* ¶ 5. The trial court eventually ordered the defendant to submit to an examination by the State's expert. *Id.* ¶ 20. The defendant refused to submit to the ordered examination, so the trial court excluded the testimony of the defendant's expert. *Id.* ¶ 21. On appeal, the defendant argued that his constitutional right to present the circumstances surrounding his inculpatory statements had been violated by the exclusion of his expert's testimony.

¶ 56    The First District determined that the matter actually turned on the question of whether the trial court had abused its discretion by conditioning the admission of the defendant's expert testimony on his submission to an examination by the State's expert. *Id.* ¶¶ 50, 52. The First District ruled that the trial court did not abuse its discretion, as section 115-6 authorized the psychological examination of the defendant by the State's expert. *Id.* ¶ 55. While the defendant did not explicitly raise any of the defenses mentioned by section 115-6, he had, by raising the way that his mental health had affected his inculpatory statement, justified a "reasonable belief by the trial judge that defendant was attempting to raise a mental status defense, like insanity or guilty but mentally ill, therefore warranting an order of an examination by a State expert." *Id.* That belief, the court found, fell within the language of section 115-6. *Id.* The First District further found that, even if section 115-6 did not strictly require the trial court to order a psychological examination under the circumstances presented, it did not follow that the statute prohibited one. *Id.* ¶ 56. Nothing in section 115-6 bars a court from ordering an examination simply because the circumstances do not fall within those the statute expressly enumerates. *Id.* The First District found

28

that even if the circumstances at issue fell outside of section 115-6, a trial court has the "inherent authority or power to manage and control the proposed evidence the parties intend to present, and the court can limit that testimony when it would serve to confuse or confound the jury." *Id.* ¶ 57 (citing *People v. Johnson*, 2018 IL App (1st) 140725, ¶ 58). It further found that a trial should be a search for the truth and that combining that with the trial court's inherent power to manage evidence suggested the conclusion that the trial court had the inherent authority to order defendant to submit to the psychological examination and to condition the admission of his own expert's testimony on that submission. *Id.* ¶¶ 57-59 (citing *People v. Daniels*, 75 Ill. App. 3d 35, 41 (1979)).

¶ 57     As part of its ruling, the *Comier* court discussed decisions by other courts, noting that multiple courts had determined that when "a defendant demonstrates an intention to use expert testimony from a psychiatric examination to establish a mental status defense, a court may compel the defendant to submit to an examination by a government expert." *Id.* ¶ 63. The First District also specifically examined both the *Harlacher* and *Lee* decisions as part of its analysis, finding both cases distinguishable. *Id.* ¶¶ 67-77. The First District first distinguished *Harlacher* by noting that *Harlacher* seemed to primarily turn on the trial court's erroneous belief that any mention of a defendant's mental state at trial immediately invoked section 115-6, thus requiring a defendant to submit to a psychological examination. *Id.* ¶ 72. The First District also found *Lee* readily distinguishable, as it concerned a death penalty hearing rather than a trial. *Id.* ¶ 77. The *Comier* court found that the ruling in *Lee* was narrowly focused on the issue of discovery and admissibility in a posttrial death penalty hearing and thus its holding had "no applicability to the order entered here and does not control the outcome of this appeal." *Id.* More specifically, the First District found that there was nothing in *Lee* to "to suggest that *** the supreme court would have precluded a

29

court-ordered psychiatric examination under section 115-6 in a case such as the one here, where a defendant chooses to raise a mental status defense at his criminal trial." *Id.*

¶ 58 We first note that we are not bound by either the decision in *Harlacher* or *Comier*, although we are bound by the Illinois Supreme Court's decision in *Lee*. Nonetheless, we find the present case readily distinguishable from both *Lee* and *Harlacher* and adopt the reasoning of the *Comier* court.

¶ 59 As discussed in *Comier*, *Lee* is clearly limited to its context: a death penalty hearing that took place after that defendant had already been found guilty and did not implicate circumstances where a defendant could raise his mental status as part of his defense at trial. *Lee*, 196 Ill. 2d at 381-82; *Comier*, 2020 IL App (1st) 170500, ¶ 77. Indeed, while *Lee* determined that section 115-6 did not authorize the psychological examination ordered by the trial court, the decision largely did not turn on or implicate section 115-6 at all. *Lee*, 196 Ill. 2d at 381-82.

¶ 60 *Harlacher* bears much closer resemblance to the case at bar, as it, too, concerns a defendant implicating his mental health via the voluntariness of a statement to police. 262 Ill. App. 3d at 4-8. However, we agree with the *Comier* court that *Harlacher* turned primarily on the trial court's erroneous belief that the defendant raising mental health in any context necessarily implicated section 115-6. *Id.* at 7-8; *Comier*, 2020 IL App (1st) 170500, ¶ 72. No such overbroad interpretation of section 115-6 occurred here. Indeed, the trial court in this case stated, "I understand that 115-6, the exact reading of it doesn't cover this." Thus, the reasoning of *Harlacher*, that a trial court's overbroad interpretation of section 115-6 is an abuse of discretion does not apply here. *Harlacher*, 262 Ill. App. 3d at 7-8.

¶ 61 Much like the *Comier* court, we believe this reading of *Harlacher* to be a more correct reading than one wherein *Harlacher* stands for the rigid principle that section 115-6 allows a trial

court to order a defendant to submit to a psychological examination *only* when insanity, guilty but mentally ill, or the defense of intoxicated or drugged condition are at issue. Nor do we read it as prohibiting a trial court from ordering an examination in a situation not covered by section 115-6, such as when a defendant asserts that a statement to police was involuntary. However, to the extent that *Harlacher* can be read as limiting a trial court's power to order psychological examinations outside of the situations outlined by section 115-6, we decline to follow it.

¶ 62    Of the three cases potentially applicable to the case at bar, we find *Comier* to be the most instructive and largely adopt its reasoning. We note first that the *Comier* court did not adopt a narrow reading of section 115-6. 2020 IL App (1st) 170500, ¶¶ 55-56. Rather, the *Comier* court found that the section 115-6 catchall language, covering situations where "the facts and circumstances of the case justify a reasonable belief that" insanity, guilty but mentally ill, or the defense of intoxicated or drugged condition might be raised, was broad enough to cover the facts in its own case despite the fact that none of those defenses was ever actually raised at trial. (Internal quotation marks omitted.) *Id.* We believe this is a correct reading of the statute and applies even more emphatically to the circumstances of this case than it did to those of *Comier*.

¶ 63    The goal of statutory interpretation is to give effect to the legislature's intent in promulgating the statute. *In re Christopher K.*, 217 Ill. 2d 348, 364 (2005). The plain language of a statute, when considered as a whole, with all of its relevant parts, is the best indication of that intent. *Id.* When statutory language is clear and unambiguous, other methods of construction or interpretations are unneeded. *Id.* In the case of section 115-6, the statutory language specifies that it applies not only when a defendant "gives notice" or "indicates that he intends" to raise one of the defenses listed, but also when "the facts and circumstances of the case justify a reasonable belief that the aforesaid defenses may be raised." The language of section 115-6, standing alone,

31

clearly mandates a more expansive reading than application to cases only when a defendant has explicitly indicated that he intends to pursue one of those three defenses. Much as the *Comier* court found that the defendant in that case having placed his mental state at the time of the crime at issue implicated a mental status defense in a way that triggered section 115-6, we, too, find that in this case the defendant implicated a mental status defense in a way that triggered section 115-6. Indeed, in the case at bar, defendant did so more clearly than the *Comier* defendant. Both the State and the trial court raised concerns at the hearing regarding whether defendant would, eventually, raise an insanity defense. The State's concern seems likely to have been prompted in part by defendant's statements that he intended to raise insanity as a defense during the recorded jail call with his sister prior to the hearing. However, even without the benefit of that recorded call, the concern was enough for the trial court to explicitly ask defense counsel, twice, about the possibility of raising the defense and even considered the possibility that the defense would later be raised despite defense counsel's assertions at that time. Indeed, the concerns on the part of both the trial court and the State proved prescient, as defendant did later assert insanity as a defense at trial and was ultimately found to be guilty but mentally ill. It is clear, based on the record, that despite not explicitly raising the defense of insanity at the time of the hearing regarding defendant being subjected to a psychological examination by the State's expert, facts and circumstances justifying the reasonable belief that such a defense might be raised certainly existed. As such, in this case the trial court not only had the power to order such an examination but was affirmatively required to order it under section 115-6 once the defense of insanity was raised.

¶ 64    We also agree with the *Comier* court's reasoning that section 115-6 does not act as a prohibition on a trial court ordering a defendant to undergo psychological examination in circumstances arising outside of those delineated by section 115-6. 2020 IL App (1st) 170500,

32

¶ 56. As stated by the *Comier* court, it is well accepted both that a trial should be a search for truth and that a trial court has the inherent authority to manage the proposed evidence parties intend to present. *Id.* ¶¶ 57-58 (citing *Johnson*, 2018 IL App (1st) 140725, ¶ 58, and *Daniels*, 75 Ill. App. 3d at 41). While the examination in this case pertained to a motion to suppress hearing, rather than the trial itself, as it did in *Comier*, the accurate resolution of a pretrial motion to suppress still meaningfully adds to the search for the truth at trial. An erroneous resolution of a motion to suppress based on the presentation of one-sided evidence certainly does not aid a search for the truth—such a resolution could potentially bar evidence that would be useful to the trier of fact in reaching its verdict or allow it to consider wholly inappropriate evidence, depending on which way such a resolution leaned. As such, we find that the fact that section 115-6 does not explicitly prohibit a trial court from ordering a defendant to undergo a psychological examination outside of its auspices, combined with a trial court's inherent authority to control the evidence presented as part of a trial's overall goal as a search for the truth, means that a trial court has the inherent authority to order such an examination even where section 115-6 does not apply.

¶ 65    Having examined section 115-6 and the case law most applicable to its interpretation, we thus find that the trial court did not err in ordering defendant to undergo a psychological examination by the State's expert. First, the circumstances at issue here clearly place this case squarely within the situations contemplated by section 115-6, as at the time the trial court ordered the examination, a reasonable belief that defendant would raise the defense of insanity was not only well justified, but ultimately proven accurate when defendant did, in fact, raise that defense. Second, even had the circumstances of this case fallen outside of the auspices of section 115-6, that statute is not a prohibition on a trial court ordering such examinations outside of the

circumstances outlined therein, and the trial court would have been acting well within its authority to order it.

¶ 66 Furthermore, even had the trial court erred by ordering the psychological examination at issue in this case, defendant was not prejudiced by that hypothetical error. Even assuming that this would have resulted in the suppression of defendant's video recorded statement from February 5, 2021, that statement was largely duplicative of defendant's May 26, 2021, jail call with his sister. Even without defendant's statement to police, the State would have had no issue proving defendant was the one who stabbed Ebrey and Andrews to death based on his statements in that call. Furthermore, at trial, defendant was not contesting that he was the one who killed both men. Instead, he was raising the defense of insanity and claiming that he could not appreciate the criminality of his actions. Thus, the inclusion of defendant's statements to police had little bearing on the outcome of his trial.

¶ 67 Defendant further tries to claim that he was prejudiced by the trial court's allegedly erroneous ordering of the psychological examination because, had the trial court not ordered the psychological examination at that time, Dr. Cuneo would not have had the benefit of his earlier 2023 interview of defendant and therefore might not have determined that defendant could appreciate the criminality of his conduct. Under defendant's theory, without the benefit of Dr. Cuneo's testimony, the evidence becomes closely balanced and defendant was therefore prejudiced by the trial court's order that he undergo a psychological examination for the purposes of the motion to suppress hearing. This argument is without merit. Once the defendant indicated he would be pursuing the defense of insanity in October 2024, section 115-6 undeniably required that he undergo a psychological examination by the State's expert. In looking at Dr. Cuneo's testimony, it is clear that he took many factors into account, not just the 2023 interview and its

34

contradictions with defendant's other statements. There is no question that the State would still have benefited from Dr. Cuneo testifying that defendant could appreciate the criminality of his conduct, even if the 2023 interview never been ordered. Moreover, we note that proving the defense of insanity was defendant's burden, one that he was unlikely to meet without the benefit of his own expert stating affirmatively that he could not appreciate the criminality of his conduct, even had Dr. Cuneo not testified at trial. The defendant was not prejudiced at trial by the trial court ordering him to undergo a psychological examination for the purpose of the motion to suppress hearing, either in the form of the admission of his statements to police on February 5, 2021, or based on its impact on the trial testimony of Dr. Cuneo.

¶ 68                                    III. CONCLUSION

¶ 69    For the foregoing reasons, we affirm the judgment of the circuit court of Madison County.


¶ 70    Affirmed.

*People v. Andrews*, 2026 IL App (5th) 250290

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Madison County, No. 21-CF-313; the Hon. Neil T. Schroeder, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Santiago A. Durango, and Dimitri Golfis, of State Appellate Defender's Office, of Ottawa, for appellant. |
| **Attorneys for Appellee:** | Thomas Haine, State's Attorney, of Edwardsville (Patrick Delfino, Thomas D. Arado, and Justin A. Nicolosi, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |